## STRACHAN *v.* MEYERING.

FRAUD — TRIAL — DIRECTING VERDICT ON OPENING STATEMENT — BROKERS.

Upon plaintiff's opening statement showing that the action was brought for false representations of defendants in a real estate deal wherein defendants, acting as brokers, induced plaintiff to pay $30,000 for certain apartments by stating to plaintiff that this was the lowest sum at which the owners would sell, although the owners' price was $24,000, the brokers receiving all they could secure above that amount, and although plaintiff claimed to have paid defendants $200 to secure for him the lowest price, the court erred in directing a verdict for defendants without receiving proofs; the question of fraud was for the jury.

Error to Wayne; Murfin, J. Submitted June 26, 1911. (Docket No. 34.) Decided January 23, 1912.

Case by James Strachan against John H. Meyering and another for fraud. A judgment for defendants on a verdict directed by the court is reviewed by plaintiff on writ of error. Reversed.

*George A. Safford*, for appellant.

*Walker & Spalding*, for appellees.

MOORE, C. J. The plaintiff holds an assignment of any claim his wife has against defendants. It is his claim that he is entitled to recover a large sum because of false representations made to himself and wife by the defendants, who were in the real estate business.

The trial of the case was entered upon and some testimony taken, when the following occurred:

"*The Court:* If I understand from your opening, Mr. Safford, and from this case as it has thus far developed, you make no claim that there was any representation as to the value of this property as a result of which you were defrauded?

"*Mr. Safford:* No.

"*The Court:* But it is your claim that the representation was made because the Morrises were very hard up; that they were compelled to and would therefore sell it at a sacrifice; that selling at a sacrifice, $30,000 was the very least they would take for it.

"*Mr. Safford:* That was the final, $30,000. First $35,000, then dropped to $32,000, finally down to $30,000.

"*The Court:* Finally $30,000?

"*Mr. Safford:* Yes.

"*The Court:* Those two statements, or those two circumstances, constitute the gist of this action, do they not?

"*Mr. Safford:* I believe it.

"*The Court:* Take this case in its facts as thus far developed, and the preliminary portion of it is not controverted that this property was listed with these defendants by its former owner for $25,000 net to them. There is no talk as to what their commission is to be, or anything else. We will assume, for the purpose of this present discussion, that they were to realize, as their commission, whatever they could get over and above $25,000 for it. Where is the line of demarcation? Are they compelled, even when they have property on sale for those terms, to sell it for just such a figure as will give them the board rate, or may they not sell it, if they are fortunate enough to do so, for $50,000 and keep the balance?

"*Mr. Safford:* That depends entirely upon circumstances, may the court please. The law will not permit a man to retain the fruits of his falsehood, if that falsehood is such as is material to the matter under consideration, and does lead the party acting upon it to do some-

thing which results in his injury. The principle is this: That it does not matter whether the transaction is a profitable one or not, if it is brought about by falsehood or misrepresentation; the law will not permit a man guilty of that misrepresentation to retain the fruits of his fraud. It does not matter whether it comes from misrepresentation as to the value of the property or misrepresentation as to what the owner of the property will sell it for."

In the course of the discussion, the following took place:

"*The Court:* It resolves itself into, after all, a discussion as to whether or not the representation is a material representation?

"*Mr. Safford:* Certainly. Here is a case where a person represents the owner. He is in a position to know what the owner will take for the property, what the owner's selling price is on that property. He tells this man that $30,000 is the lowest figure at which they would sell the property.

"*The Court:* What have your clients lost by this, if there is no question about it being worth $30,000?

"*Mr. Safford:* The question of its value does not come into this case at all. We don't know today whether it is worth $30,000 or not.

"*The Court:* Then what have you lost?

"*Mr. Safford:* We have lost this.

"*The Court:* Suppose he has got for $30,000 a piece of property worth $50,000. May he maintain an action because he did not get it cheaper than that?

"*Mr. Safford:* Absolutely he may, providing, if the court please, that he was induced to pay more than he should have been required to pay, had the truth been told him. A real estate agent does not have absolute authority to misrepresent the facts any more than an attorney has. Another thing, if the court please, right here is something in the very contract or proposal that they have for the $30,000. From this it appears that they promised him they would do the very best they could do for him, and he agreed to pay them $200 for doing it.

"*The Court:* Which is the most reprehensible and unconscionable arrangement to make.

"*Mr. Safford:* No doubt about it—

"*The Court:* Do you think I am going to countenance any such arrangement as that in this courtroom?

"*Mr. Safford:* The situation is this—

"*The Court:* His buying the other man's agent is not very commendable, and clearly not enforceable.

"*Mr. Safford:* That is true enough, but we are not seeking to enforce it. But it shows this: That between the Meyerings and Mr. Strachan there was a confidential relation existing.

"*The Court:* I don't agree with you. Whatever confidential relation there was existing between these people was a most unconscionable one."

Thereupon, after some colloquy between court and counsel, citation of authorities and discussion of the case, it was agreed that the opening statement of counsel might be considered as an offer of proof, and the jury was called in and directed to find a verdict for defendant.

The course taken makes it necessary to refer to the opening address. It was stated therein, in substance, that defendants had the Wilbert Apartments for sale in Detroit, and that because of their extravagance the owners wanted to sell them, and their price was $35,000. We now quote:

"That, either in that conversation or some of the conversations had there, Mr. Strachan expressed a desire to get the property, if he got it at all, for the lowest possible figure. He offered the Meyerings the sum of $200, in addition to what commission they might get from the Morrises, to get him the best possible figure they could get for the property. We expect to show a number of details showing how he worked himself into the confidence of these people. I don't care to relate them now, but we expect to show to you that before he left on that occasion he had gotten the confidence of Mr. and Mrs. Strachan to the extent that they authorized him to make a contract for them involving the outlay of $25,000, without their having seen the property; relied upon him to give them the very best offer that the Morrises would take on that property, if they would not sell for $25,000. After his return to Detroit, further correspondence was had between them. That finally the Meyerings notified Mr. Strachan that the best they could possibly do with Mrs. Morris was $32,000, and advised him to take it up then, if they didn't want to have it snapped up quick at that figure, or words to that effect. But that Mr. Strachan either wrote or

wired back to the effect that it was $30,000 or no deal.
Shortly after that, he received instructions to come on to
Detroit to close up the deal. When he got here to Detroit,
he saw one or both of the Meyerings, and wanted an in-
troduction to either Mr. or Mrs. Morris to see if he could
not get the property at a little better figure than $30,000,
but they told him there was no use for him to see them.
'We have the sale of this property, and it will simply
spoil the whole deal if you go talking with them. We
can do better with them than you can do.' So they made
appointments with Mr. Strachan at one place, made ap-
pointments with Mr. and Mrs. Morris elsewhere, and kept
the parties apart until the day that the contract was
finally consummated. That finally it was reported
to Mr. Strachan that the lowest price at which
they would sell the apartment was $30,000. By the
way, in place of being a sale, it was really a trade;
the bargain or understanding being between the Mey-
erings, representing Mrs. Morris, and Mr. Strachan that
Mr. Strachan's property at the Soo should be taken
in at a valuation of $10,000; it being one of the objects of
Mr. Meyering, he claimed, to examine that property when
he came to the Soo to see whether it was worth what Mr.
Strachan claimed it was worth. That they made some
other investigations. But the real transaction was a trade
of the Soo property for the Wilbert apartments; the Soo
property being taken in at $10,000, and the Wilbert Apart-
ments at $30,000. Upon the Wilbert Apartments there
was then a $12,000 mortgage, subject to which Mr. Stra-
chan was to take it. He was to pay $2,000 in cash, and
either give a second mortgage back for $6,000, or take a
contract for the $6,000 and buy the Wilbert Apartments
subject to the $12,000 mortgage. We expect to show that
the Meyerings represented to Mr. and Mrs. Strachan that
because of the financial straits of the Morrises that it was
absolutely essential .that they should get at least $7,000 in
cash in the transaction some way. * * * But, at any
rate, the deal was carried through, and the net result of
the transaction was this: That Mr. Morris received all
that he asked for the property, all that they asked for the
property, which was $24,000 net. That before these ne-
gotiations were opened up at all, and at the time the Mey-
erings first represented to Mr. Strachan that Mrs. Morris
wanted $35,000 for her property, and that was a great
sacrifice, that before that time she had placed the property

with the Meyerings, and authorized them to sell it for $24,000 net. Whatever they got above that would be their commission. She wanted $24,000 net for the property, and was willing to take $6,000 in money, sell the property subject to a second mortgage, or upon contract for the $6,000 remaining, and subject to the $12,000 mortgage on the property. Those facts were kept from Mr. Strachan."

There were many other things stated in the opening, but we think this sufficient to show the question involved.

Counsel for defendants say the leading case applicable to this one is *Vernon* v. *Keys*, 12 East, 632, and that the course taken by the trial judge was proper. It is contended the case is controlled by the recent case of *Hokanson* v. *Oatman*, 165 Mich. 512 (131 N. W. 111). We do not know what may develop when the proofs are taken, but we think counsel should have been allowed to put in his testimony and have the jury pass upon the case when all the proofs are in, under proper instructions from the judge.

Judgment is reversed, and a new trial ordered.

McALVAY, STONE, and BIRD, JJ., concurred with MOORE, C. J. OSTRANDER, J., concurred in the result.